**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| APRIL H. YOUNG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No:  07 CV 1994 (BSJ) |
| v. | ) | |
| | ) | ECF Case |
| GENERAL MOTORS INVESTMENT | ) | |
| MANAGEMENT CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF GENERAL MOTORS**
**INVESTMENT MANAGEMENT CORPORATION'S**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

James Lee (JL-5641)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800

Robert J. Kopecky
Timothy A. Duffy
John W. Reale
Colleen Sorenson
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  (312) 861-2000

*Attorneys for Defendant General Motors*
*Investment Management Corporation*

June 25, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    The GM Savings Plans ..................................................................................... 3

    The Single Equity Funds ................................................................................. 4

    The Fidelity Funds ........................................................................................... 5

    Plaintiffs' Claims ............................................................................................. 6

ARGUMENT ........................................................................................................... 7

I.     PLAINTIFFS' CLAIM THAT THE SINGLE EQUITY FUNDS WERE
      IMPRUDENT PLAN INVESTMENTS SHOULD BE DISMISSED............................. 8

    A.    Plaintiffs' Claim That The Single Equity Funds Were Imprudent Plan
         Investments Is Barred By The Statute Of Limitations. ........................... 8

    B.    Plaintiffs Have Failed To State A Claim That The Single Equity Funds
         Were Imprudent Plan Investments. ........................................................ 9

II.    PLAINTIFFS' CLAIM THAT THE FIDELITY FUNDS WERE IMPRUDENT
      PLAN INVESTMENTS SHOULD BE DISMISSED. .................................... 12

    A.    Plaintiffs' Claim That The Fidelity Funds Were Imprudent Plan
         Investments Is Barred By The Statute Of Limitations. ......................... 12

    B.    Plaintiffs Have Failed To State A Claim That The Expenses And Fees
         Associated With The Fidelity Funds Rendered Them Imprudent Plan
         Investments. .......................................................................................... 14

    C.    Plaintiffs Have Failed To State A Claim That The Expenses And Fees
         Associated With The Fidelity Funds Have Caused Any Damage To The
         Plans. .................................................................................................... 17

    D.    Plaintiffs' Claim Involving The Fidelity Funds Is Barred By ERISA
         § 404(c), Which Expressly Exempts Participant Controlled Accounts
         From Claims For Breach Of Fiduciary Duty Arising From Investment
         Losses. .................................................................................................. 19

CONCLUSION ....................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006).............................................................................. 7, 15, 17

*Bell Atlantic Corp. v. Twombly*, __ U.S. __,
    127 S. Ct. 1955 (2007)........................................................................................ 7, 15

*Brock v. Citizens Bank of Clovis*,
    841 F.2d 344 (10th Cir. 1988) ................................................................................ 10

*Caputo v. Pfizer*,
    267 F.3d 181 (2d Cir. 2001).................................................................................... 8

*Davey v. Dolan*,
    453 F. Supp. 2d 749 (S.D.N.Y. 2006).................................................................... 21

*DiFelice v. U.S. Airways, Inc.*,
    436 F. Supp. 2d 756 (E.D.Va. 2006) ..................................................................... 11

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................................. 17

*Fink v. National Savings and Trust Co.*,
    772 F.2d 951 (D.C. Cir. 1985)................................................................................ 8

*Fitzgerald v. Citigroup, Inc.*,
    2007 WL 582965 (S.D.N.Y. Feb. 23, 2007)........................................................ 3, 15

*GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*,
    895 F.2d 729 (11th Cir. 1990) ............................................................................... 10

*Gray v. Briggs*,
    45 F. Supp. 2d 316 (S.D.N.Y. 1999)..................................................................... 10

*Hecker v. Deere & Company*,
    No. 06-C-719-S, Mem. Op. (W. D. Wis. June 21, 2007) ......................................... 20, 22

*In re Gartenberg*,
    636 F.2d 16 (2d Cir. 1980)..................................................................................... 15

*Jones v. O'Higgins*,
    1989 WL 103035 (N.D.N.Y. Sept. 5, 1989) .......................................................... 10, 11

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
    173 F.3d 313 (5th Cir. 1999) ................................................................................. 11

*Langbecker v. Electronic Data Systems Corp.*,
   476 F.3d 299 (5th Cir. 2007) ............................................................ 22

*Marshall v. Teamsters Local 282 Pension Trust Fund*,
   458 F. Supp. 986 (E.D.N.Y. 1978) ................................................... 10

*McKenna v. Wright*,
   386 F.3d 432 (2d Cir. 2004) .............................................................. 21

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2nd Cir. 1998) .............................................................. 21

*Phillips v. Alaska Hotel and Restaurant Employees Pension Fund*,
   944 F.2d 509 (9th Cir. 1991) ............................................................... 8

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................ 3

*Rothman v. Gregor*,
   220 F.3d at 81 (2d Cir. 2000) .............................................................. 3

*Salovaara v. Eckert*,
   1998 WL 276186 (S.D.N.Y. May 28, 1998) ..................................... 17

*Sandoval v. Simmons*,
   622 F. Supp. 1174 (C.D. Ill. 1985) ................................................... 11

*Silverman v. Mutual Benefit Life Ins. Co.*,
   138 F.3d 98 (2d Cir. 1998) ................................................................ 17

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ........................................................................... 15

*Wright v. Heyne*,
   349 F.3d 321 (6th Cir. 2003) ............................................................... 9

**Statutes**

29 C.F.R. § 2550.404a-1 .......................................................................... 11

29 C.F.R. § 2550.404c-1 ..................................................................... 12, 21

29 U.S.C. § 1104(a) ............................................................................... 7, 10

29 U.S.C. § 1104(c) .................................................................................. 20

29 U.S.C. § 1109 ........................................................................................ 6

29 U.S.C. § 1113(2) ................................................................................... 8

29 U.S.C. § 1132(a)(2).............................................................................................................. 6

**Treatises**

Kleiman, et al., *Forming, Organizing and Operating a Mutual Fund:  Legal and*
    *Practical Considerations*,
    1589 PLI/Corp 235 (PLI, 2007)....................................................................................... 16

## INTRODUCTION

Plaintiffs attempt to assert two distinct ERISA claims against General Motors Investment Management Corporation ("GMIMCo") in its alleged role as a fiduciary responsible for investments made by four defined-contribution retirement plans sponsored by General Motors Corporation (or its wholly owned subsidiary, Saturn Corporation). Each of the plans at issue permits participants to direct their individual contributions and account balances across a broadly diversified menu of investment options. The plans then invest the contributions as directed by the participants in their specified investment choices. Plaintiffs purport to bring these claims under Section 502(a)(2) of ERISA, which allows a participant to sue a plan fiduciary for a breach of fiduciary duty on behalf of the plan.

In Count I, plaintiffs claim that GMIMCo breached its fiduciary duty by allowing the plans to invest in five funds that held only a single equity security: the EDS Common Stock Fund, which held stock of Electronic Data Systems Corporation; the DIRECTV Group Common Stock Fund, which held stock of DIRECTV; the News Corporation Non-Voting Common Stock Fund, which held American Depository Shares of News Corporation; the Delphi Common Stock Fund, which held stock of Delphi Corporation; and the Raytheon Common Stock Fund, which held stock of Raytheon Corporation (collectively, "the Single Equity Funds"). Plaintiffs claim that the Single Equity Funds were imprudent investments because they were not diversified, and seek to hold GMIMCo liable for losses plaintiffs claim the plans suffered by investing in the Single Equity Funds.

In Count II, plaintiffs claim that GMIMCo breached its fiduciary duty by allowing the plans to invest in mutual funds offered under the Fidelity brand name ("the Fidelity Funds"). Plaintiffs allege that the fees charged by the Fidelity Funds were excessive, and that permitting

investments in these funds has caused the plans to pay "millions of dollars" that could have been avoided by selecting cheaper, alternative investments.

Neither of plaintiffs' two claims states a viable cause of action under ERISA. Plaintiffs' claim in Count I is time-barred because plaintiffs had actual knowledge of the facts on which their claim is based more than three years before filing this suit. In addition, plaintiffs' claim in Count I fails because including the Single Equity Funds among the plans' numerous and diverse investment funds did not violate the obligation that the plans' investments be diversified. Plaintiffs have not alleged (and could not allege given the facts) that the plans' investments in the Single Equity Funds rendered the plans' investment portfolios as a whole undiversified, and it is a plan's investment portfolio as a whole that provides the relevant measure for a claim for failure to diversify under ERISA.

There are four independent grounds on which to dismiss plaintiffs' claim in Count II regarding the plans' investment in the Fidelity Funds. First, like plaintiffs' claim regarding the Single Equity Funds, their claim involving the Fidelity Funds is barred by the statute of limitations. Second, plaintiffs do not state a viable claim for breach of fiduciary duty because they have failed to allege sufficient facts to support their conclusory assertion that the fees and expenses associated with the Fidelity Funds were so excessive that inclusion of these funds as investment options violated ERISA. Third, plaintiffs have failed to allege any plausible factual basis for their claim that the plans have been damaged as a result of investments in the Fidelity Funds. Finally, plaintiffs' claims are barred by ERISA § 404(c) because the plans' investments in the Fidelity Funds resulted from decisions made by individual plan participants, and Section 404(c) bars claims for breach of fiduciary duty for investment losses resulting from decisions made via participant-directed accounts.

## BACKGROUND

### The GM Savings Plans

Plaintiffs' Complaint purports to state claims with respect to the following defined-contribution pension plans:  the General Motors Savings-Stock Purchase Program for Salaried Employees ("the Salaried Plan"), the General Motors Personal Savings Plan for Hourly Rate Employees in the United States ("the Hourly Plan"), the General Motors Income Security Plan for Hourly Rate Employees ("the Income Security Plan"), and the Saturn Individual Savings Plan for Represented Members ("the Saturn Plan") (collectively, "the Plans").[1]   (Cmplt.  ¶ 2) According to the Complaint, the assets of all of the Plans are held in the General Motors Savings Plan Master Trust ("the Master Trust"), which maintains a number of investments (*id.* at ¶¶ 39-40), including the collective trusts that hold the securities represented by the Single Equity Funds (*id.* at ¶ 60), and a variety of mutual funds, including the Fidelity Funds (*id.* at ¶ 38). [2]

Plaintiffs claim that GMIMCo served as the named fiduciary "for purposes of investment of Plan assets," and, in accordance with the governing Plan documents and ERISA, "had discretionary control and authority to buy, sell, or hold assets of the Plans, including investments in the Single Equity Funds" and "discretionary control and authority to select or remove the

---

[1] In addition to the allegations in the Complaint, the Court may consider the contents of documents referenced in the Complaint.  *See*, *e.g.*, *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  The Court may also consider public disclosure documents filed with the SEC, as well as documents either in plaintiffs' possession or of which they had knowledge and relied on in bringing suit.  *Rothman v. Gregor*, 220 F.3d at 81, 88 (2d Cir. 2000).  *See also Fitzgerald v. Citigroup, Inc.*, 2007 WL 582965 at *5 (S.D.N.Y. Feb. 23, 2007).  Accordingly, for purposes of this motion, it is appropriate for the Court to consider:  (1) the GM Plan documents, (2) prospectuses for the Plans, (3) SEC Forms filed by GM as sponsor of the Plans, (4) Forms 5500 for the Plans filed with the Department of Labor ("DOL"), and (5) account statements and other materials provided to plaintiffs pursuant to the Plans.  (*See* Cmplt. at 1; *see also id.* at ¶¶ 74-75)

[2] The Income Security Plan has never held any of the Single Equity Funds or the Fidelity Funds. Its investments are limited to low-risk, income-producing securities.

Fidelity Funds as investments [sic] options for the Plans." (*Id.* at ¶ 52)  During the relevant period, the Plans offered participants a broad, diversified set of investment options, including dozens of mutual funds and various other investments.

**The Single Equity Funds**

The Plans provided for investment in GM $1 2/3 par value Common Stock and, prior to 1996, two "tracking" stocks issued by GM, "GM Class E Stock" and "GM Class H Stock," that were intended to reflect the performance of GM's wholly owned subsidiaries EDS and Hughes Electronics, respectively. (*Id.* at ¶¶ 43-45)  In 1996, GM spun off EDS and the holders of GM Class E Stock, including the Plans, received stock in EDS, which was held in the EDS Fund. (*Id.* at ¶ 45)  In 1997, GM sold a portion of Hughes Electronics to Raytheon, and holders of GM Class H stock received Raytheon stock as a result of the transaction, which was held in the Raytheon Fund. (*Id.* at ¶ 44)  In 1999, GM spun-off its parts subsidiary, Delphi, and, as holders of GM stock, the Plans received Delphi Stock, which was held in the Delphi Fund. (*Id.* at ¶ 46)  Finally, GM disposed of the remainder of Hughes in 2003 in a transaction that gave holders of GM Class H stock shares of DIRECTV and News Corp., which was held in the DIRECTV and News Corp. Funds, respectively. (*Id.* at ¶ 44)

The Plans did not purchase any of the stock in the Single Equity Funds.  Rather, each of the Single Equity Funds was formed as a result of a corporate transaction that resulted in holders of GM stock, including the Plans, receiving the stock of a non-GM company. (*Id.* at ¶¶ 43-46)  Each of the Single Equity Funds has been closed to new investment since it was formed (*see*, *e.g.*, Ex. A at 25-27; Ex. B at 23-25),[3] and thus none of the Plans (and no individual Plan

---

[3] Exhibits A & B are Prospectuses, dated February 1, 2004, for the Salaried Plan and the Hourly Plan, respectively.  These documents are among those expressly relied upon by plaintiffs in the Complaint. (Cmplt. at 1)

participants) ever increased their holdings in the Single Equity Funds beyond the amount of stock each received as a result of the transactions outlined above.  Indeed, the Plans' holdings in the Single Equity Funds have decreased over time as participants disposed of their investments in the Funds, which they have been permitted to do ever since the inception of the Funds.  (Ex. C)[4]

The Plans' investments in the Single Equity Funds have always comprised only a very small portion of total Plan investments.  In fact, plaintiffs do not (and cannot) allege that any Single Equity Fund ever accounted for more than 4% of the assets held by the Hourly and Salaried Plans at the end of each fiscal year, or that aggregate holdings of all of the Single Equity Funds combined ever accounted for more than 5% of the assets of those Plans as a whole at the end of any year.  (*Id.*)[5]

**The Fidelity Funds**

As part of their broad array of investment options, the Plans offered participants the choice to invest their accounts in a wide variety of mutual funds, including dozens of different Fidelity Funds.  (*See*, *e.g.*, Ex. A at 14-35)  Fidelity is one of the world's best-known financial services firms, with trillions of dollars of assets under management for thousands of individuals

---

[4] Exhibit C is a compilation of excerpts from the Forms 11-K filed by GM for the Salary and Hourly Plans for the years ending December 31, 1996 through December 31, 2005 that show the amounts of the assets held by each of the Plans and the Master Trust's holdings in the Single Equity Funds as of December 31st of each year.  These documents are also relied upon in plaintiffs' Complaint.  (Cmplt. at 1)

[5] These percentages are derived from the Form 11-K's filed by the Plans with the SEC for each year from when the Plans first acquired EDS stock in 1996 (Ex. C at 10-18), through the end of 2005 (*id.* at 102-112), which is the most recent filing that was available to plaintiffs at the time they filed their Complaint.  For example, as of December 31, 2004, the GM Master Trust held $21.7 billion dollars of assets.  (Ex. C at 95)  As of that date, the Master Trust held EDS stock worth $50.6 million, Delphi stock worth $154.3 million, New Corp. stock worth $90.7 million, DIRECTV stock worth $369.9 million, and Raytheon stock worth $78.7 million.  (*Id.* at 94-95)  DIRECTV – the largest of these single-equity holdings by a factor of two – accounted for only 1.7% of the Master Trust's assets.  The Plan's combined single-equity holdings of $744.2 million accounted for only 3.4% of total Master Trust assets.

and retirement plan investors.  Like all mutual funds, the Fidelity Funds have costs associated with them, including payments to managers and other service providers, which reduce the funds' total returns and thus are indirectly paid by the holders of shares in the funds (including the Plans).  (Cmplt. ¶ 72)  Plaintiffs claim that the Plans, as large operators and investors, could have negotiated lower-cost alternative investment options for Plan participants, such as collective trusts or privately managed investment pools.  (*Id.* at ¶¶ 74-75)  While plaintiffs allege that such alternative investments would have had lower costs than the Fidelity Funds, they do ***not*** allege that net returns on those investments would have been greater as a result of such actions.

The Plan also offered participants the option of investing in several collective investment funds known as the Promark funds.  The Promark Funds were funds managed (in all cases but one) by an affiliate of GMIMCo, making use of the same investment advisors and asset pools that GMIMCo uses to manage other retirement plan assets.  (Ex. A at 9, 14-15, 18-24; Ex. B at 7, 12-13, 16-22)  These funds are not mutual funds, but are precisely the sort of investments that plaintiffs criticize GMIMCo for ***not*** offering.  (Cmplt. ¶ 73)  Not surprisingly, plaintiffs make no mention of them in their Complaint.

## Plaintiffs' Claims

Of the four plaintiffs in this case, two claim to be participants in the Salaried Plan, and two claim to be participants in the Hourly Plan.  (*Id.* at ¶¶ 13-16)  They purport to bring their claims under ERISA § 502(a)(2), which provides that a participant in a Plan may bring an action "for appropriate relief under [ERISA § 409]."  29 U.S.C. § 1132(a)(2).  Section 409 provides for claims on behalf of a plan against fiduciaries:  "[A] fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ."  29 U.S.C. § 1109.

Among the fiduciary duties specified in ERISA is the "prudent man" standard of care, under which a fiduciary is required to "discharge his duties with respect to a plan solely in the interests of participants and beneficiaries and . . . with the skill, care, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). Plaintiffs allege that GMIMCo breached its duty under this standard of care when it allowed the Plans to invest in the Single Equity Funds because these particular investments were not "diversified." (Cmplt. ¶ 92) Plaintiffs also allege that GMIMCo breached this duty when it allowed the Plans to invest in the Fidelity Funds because the fees charged by the Funds were "excessive." (*Id.* at ¶ 97) Plaintiffs do not allege that GMIMCo ever misrepresented or failed to disclose either the non-diversified nature of the Single Equity Funds or the fees charged by the Fidelity Funds.

## ARGUMENT

In considering a motion to dismiss, the Court generally accepts as true the allegations of a plaintiff's complaint. The Second Circuit, however, has specifically rejected the argument that all a plaintiff need do is give "fair notice" of a claim and "the grounds upon which it rests." *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343-44 (2d Cir. 2006). Rather, in order to survive a motion to dismiss, a complaint must contain allegations that, if true, are "sufficient to establish liability." *Id.* at 344. The alleged liability must be based on well-pled facts, and "bald assertions and conclusions of law will not suffice." *Id.* As the Supreme Court recently made clear in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007), "a plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* (internal quotations omitted).

I.  **PLAINTIFFS' CLAIM THAT THE SINGLE EQUITY FUNDS WERE IMPRUDENT PLAN INVESTMENTS SHOULD BE DISMISSED.**

Plaintiffs' claim in Count I should be dismissed because it is barred as a matter of law by ERISA's three-year statute of limitations and, in any event, is insufficient to state a legally viable claim for breach of fiduciary duty.

A.  **Plaintiffs' Claim That The Single Equity Funds Were Imprudent Plan Investments Is Barred By The Statute Of Limitations.**

ERISA requires that breach-of-fiduciary-duty claims be brought within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).  A plaintiff has "actual knowledge" of a breach "when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act."  *Caputo v. Pfizer*, 267 F.3d 181, 193 (2d Cir. 2001).  A plaintiff need not know the law, but instead must only "have knowledge of all facts necessary to constitute a claim."  *Id.*  Significantly for purposes of this case, where the alleged breach stems from a transaction that a plaintiff claims is "inherently a statutory breach of fiduciary duty," knowledge of the transaction "standing alone" is sufficient to trigger the obligation to file suit. *See Fink v. National Savings and Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985), *quoted in Caputo*, 267 F.3d at 193.

Plaintiffs claim that GMIMCo breached its fiduciary duty to the Plans by offering the Single Equity Funds because the Funds "were not diversified" and were therefore "not suitable retirement plan investments."  (Cmplt. ¶ 92)  If, as plaintiffs claim, it was inherently imprudent for the Plans to invest in these Funds because each held the stock of a single company, then plaintiffs had knowledge of this claim when they learned that each Fund was a single-equity fund.  *See*, *e.g.*, *Phillips v. Alaska Hotel and Restaurant Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) (ERISA's statute of limitations on breach-of-fiduciary-duty claims "requires

8

the plaintiff's knowledge to be measured from the 'earliest date' on which he or she knew of the breach."); *Wright v. Heyne*, 349 F.3d 321, 328-30 (6th Cir. 2003) (collecting cases).

There can be no dispute that ***all*** of the Plans' (and therefore plaintiffs') investments in the Single Equity Funds were made prior to 2004 – more than three years prior to the filing of this lawsuit.  The Complaint alleges the EDS Fund was established in 1996, the Raytheon Fund in 1997, the Delphi Fund in 1999, and the News Corp. and DIRECTV Funds in late 2003.  (Cmplt. ¶¶ 43-46)  Since each of the Funds was established, they have all been closed to new investment. (*See* A at 25-27; Ex. B at 23-25)  Plaintiffs do not and cannot allege that a single dollar has been added to any of these Funds since late 2003.[6]  (*See id.*)

Nor can plaintiffs dispute that they had "actual knowledge" of the Plans' investments in the Single Equity Funds at or before the time those investments were made.  The prospectuses on which plaintiffs themselves relied in filing their Complaint (*see* Cmplt. at 1) plainly disclosed that the Single Equity Funds were undiversified investments holding the stock of a single company.  Prospectuses for the Plans issued as of February 1, 2004, for example, disclosed this information for each of the Single Equity Funds, including the then-recently established News Corp. and DIRECTV Funds.  (Ex. A at 25-27; Ex. B at 23-25)  Plaintiffs thus had knowledge of all of the facts they now allege establish a breach of fiduciary duty by GMIMCo more than three years before filing this lawsuit on March 8, 2007, and their claim should be dismissed.

### B.      Plaintiffs Have Failed To State A Claim That The Single Equity Funds Were Imprudent Plan Investments.

In order to state a claim for a breach of the duty to diversify Plan investments, plaintiffs must allege facts sufficient to establish that GMIMCo violated ERISA § 404(a)(1)(C), which

---

[6] Any dividends received by Plan participants as a result of holdings in the Single Equity Funds were invested in the Promark Income Fund, and not reinvested in the Single Equity Funds.  (Ex. A. at 25-27; Ex. B at 23-25)

states that a "fiduciary shall discharge his duties with respect to a plan . . . by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  29 U.S.C. § 1104(a)(1)(C).  *See Gray v. Briggs*, 45 F. Supp. 2d 316, 327 (S.D.N.Y. 1999) (plaintiff bears the burden of establishing failure to diversify). Plaintiffs have not alleged (and cannot allege) that the Plans' investments as a whole were undiversified, and therefore they have not stated a claim that GMIMCo breached any fiduciary duty in allowing the Plans to invest in the Single Equity Funds.

In decisions that have upheld claims for failure to diversify, a substantial portion of the plan's assets was invested in an undiversified asset.  *See*, *e.g.*, *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 346 (10th Cir. 1988) (committing over 65% of plan assets to commercial real estate mortgages in single locale violated duty to diversify); *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 733 (11th Cir. 1990) (fund containing 70% of assets in 30-year Treasury bonds not properly diversified); *Jones v. O'Higgins*, 1989 WL 103035 at *6 (N.D.N.Y. Sept. 5, 1989) (plaintiff stated a claim by alleging over 90% of fund assets were held in three stocks); *Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F. Supp. 986, 991 (E.D.N.Y. 1978) (decision to loan 36% of plan's assets to a developer violated duty to diversify).  GMIMCo has found no case holding that an investment comprising less than 5% of a plan's total assets can support a claim for a violation of the diversification requirement.

Plaintiffs do not allege, and cannot seriously contend, that the Plans' investments in the Single Equity Funds caused the Plans' entire asset portfolios to be undiversified.  Throughout the period in question, the Hourly and Salaried Plans offered participants a broad, diversified array of more than 70 investment choices.  (*See*, *e.g.*, Exs. A & B)  The Single Equity Funds were never, strictly speaking, investment "options" – participants could not and did not direct

10

contributions or exchanges into the Funds – and the Funds never comprised a significant portion of Plan assets.  Indeed, the Single Equity Funds *combined* never accounted for more than 5% of the assets held by the Master Trust at the end of any fiscal year, and most of the Funds individually accounted for less than 1 or 2% of the assets of the Master Trust.  (Ex. C)

Plaintiffs base their diversification claim on the legally erroneous theory that each separate asset held by the Plans, no matter how small a part of total plan assets, must itself be diversified in order to satisfy Section 404(a)(1)(C).  The appropriate measure of the duty to diversify the Plans' investments, however, is whether the Plans' investments *as a whole* are diversified:  "ERISA measures diversification by considering the assets of the trust as a whole, not by the assets of particular funds."  *Sandoval v. Simmons*, 622 F. Supp. 1174, 1211 (C.D. Ill. 1985) (duty to diversify not violated where 18.5%, 14%, and 11% of trust assets were invested in the stock of three respective corporations), *cited in Jones*, 1989 WL 103035 at *6.  The DOL's regulations make clear that ERISA's prudence standard incorporates the "modern portfolio theory," which requires that the prudence of a particular investment be measured viewing the investment in conjunction with the investments of a plan as a whole, not in isolation.  *See Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 322 (5th Cir. 1999) (citing 29 C.F.R. § 2550.404a-1); *DiFelice v. U.S. Airways, Inc.*, 436 F. Supp. 2d 756, 786 (E.D.Va. 2006) (same).

Funds that consist of the stock of a single corporation thus can, and do, have a place in a diversified portfolio of investments, notwithstanding that, when viewed in isolation, that fund alone could be deemed a "risky" or "undiversified" investment.  "As the portfolio management theory instructs, . . . high-risk, high-yield securities are an appropriate investment as part of a diversified portfolio."  *DiFelice*, 436 F. Supp. 3d at 786.  If plaintiffs were correct, no retirement

plan could make any investment that was not, viewed in isolation, diversified, regardless of the value that investment might have as part of a diversified portfolio.  This would, in effect, impose a "double diversification" requirement, under which all of a plan's assets would have to be invested in assets that are each diversified.  There is no basis in ERISA, or sound economics, for such a rule, and plaintiffs' claim regarding the Single Equity Funds should therefore be dismissed.[7]

## II.   PLAINTIFFS' CLAIM THAT THE FIDELITY FUNDS WERE IMPRUDENT PLAN INVESTMENTS SHOULD BE DISMISSED.

Count II Fails to state a claim because (1) it is barred by the statute of limitations, (2) plaintiffs have not adequately alleged that the Fidelity Fund fees were excessive, (3) plaintiffs have not adequately alleged that the Plans suffered any losses as a result of the fees charged by the Fidelity Funds, and (4) any losses the Plans did suffer were caused by investment choices of Plan participants.

### A.   Plaintiffs' Claim That The Fidelity Funds Were Imprudent Plan Investments Is Barred By The Statute Of Limitations.

As with plaintiffs' claim involving the Single Equity Funds, their claim involving the Fidelity Funds is barred by ERISA's three-year statute of limitations.  Plaintiffs have had "actual

---

[7] This result is consistent with regulations promulgated by the DOL requiring that, in order to meet the requirements of ERISA § 404(c), a plan must offer options that allow participants the opportunity to diversify their individual accounts:  "In determining whether a plan provides the participant or beneficiary with a reasonable opportunity to diversify his investments, the nature of the investment alternatives offered by the plan and the size of the portion of the individual's account over which he is permitted to exercise control must be considered."   29 C.F.R. § 2550.404c-1(b)(3)(C).  It would make little sense to allow plaintiffs to proceed with a claim that GMIMCo failed to diversify the Plans' investments where the same Plans would clearly be deemed to offer sufficient investment alternatives for participants to diversify their accounts under the DOL's regulations governing ERISA § 404(c), which provides a safe harbor for fiduciaries of participant-directed accounts.

knowledge" of the allegedly excessive fees charged by the Fidelity Funds for more than three years, and they failed to bring a timely claim challenging these investments by the Plans.

The Plans have maintained investments in a variety of funds issued under the Fidelity brand name for more than 10 years. (*See*, *e.g.*, Ex. D (excerpts from 1995 Forms 11-K for the Salaried and Hourly Plans listing investments in Fidelity Funds))  All Plan participants are regularly provided with prospectuses advising them of the investment options under the Plans. (*See*, *e.g.*, Exs. A & B)  Under the terms of the Plans, all investments are the result of directions received from individual Plan participants, and no Plan assets were invested in any of the Fidelity Funds except as a result of a participant directing that such an investment be made. (*See generally* Ex. A at 9-13; Ex. B at 7-11)  Thus, there can be no doubt that plaintiffs had actual knowledge that the Plans offered the Fidelity Funds as investment options.

Nor can there be any doubt that participants had actual knowledge of the fees and expenses associated with the Fidelity Funds, including the fact that expense ratios for some of the Fidelity Funds were higher than those for alternative investment options such as the Promark Funds.  As explained in the annual prospectuses for the Plans, a "Performance Summary" showing the "operating expense ratios" for each of the funds offered by the Plans was mailed to each Plan participant "with each quarterly account statement."   (Ex. A at 12; Ex. B at 11)  The Performance Summaries listed the expense ratio (along with additional information showing the historical performance) of each fund offered by the Plans, including each of the Fidelity Funds, as well as the other non-Fidelity funds offered by the Plans.  (Ex. E)[8]

---

[8] Exhibit E is a compilation of selected Performance Summaries that were sent to Plan participants along with their quarterly account statements more than three years prior to the filing of this suit.  (*See* Ex. A at 12; Ex. B at 11)

Plaintiffs base their fiduciary-duty claim in Count II on the assertion that the Fidelity Funds were more expensive than other investment alternatives available to the Plans. (Cmplt. ¶ 73) The Performance Summaries provided to participants demonstrate that plaintiffs had actual knowledge that the expense ratios for the Fidelity Funds were higher than those of the Promark Funds holding similar investments. (Ex. E; Ex. A at 14-24; Ex. B at 12-22; Cmplt. ¶ 73) For example, the December 31, 2003 Performance Summary for the Salaried Plan shows that the Fidelity Diversified International Fund (of which plaintiffs complain (*id.* at ¶ 74)), paid 1.24% in fees, whereas the Promark International Equity Fund incurred expenses of 0.41%. (Ex. E at 2, 3) Expenses were also disclosed for the Fidelity Balanced Fund – the only other Fidelity Fund plaintiffs specifically criticize as too expensive (*id.* at 4 (showing an expense ratio of 0.70%)), as well as the Promark Balanced Fund (*id.* at 2 (showing an expense ratio of 0.26%)).

Plaintiffs do not allege that these investments only became imprudent within the last three years. According to the Complaint, this has been true for at least the past six years. (*See* Cmplt. ¶ 75) As evidenced by the documents they were provided and by their own allegations, plaintiffs knew the fees charged by the Fidelity Funds – and that the fees for those funds were higher than those of other alternative investments – more than three years prior to filing this suit. As the cases cited above on this issue in support of GMIMCo's motion to dismiss Count I dictate, plaintiffs' claim involving the Fidelity Funds is barred by the statute of limitations.

**B.      Plaintiffs Have Failed To State A Claim That The Expenses And Fees Associated With The Fidelity Funds Rendered Them Imprudent Plan Investments.**

As noted in one of the DOL Advisory Opinions quoted by plaintiffs, ERISA "does not specify a permissible level of fees," but rather requires only that fees charged to a plan be "reasonable." (Cmplt. ¶ 84) To state a claim based on the offering the Fidelity Funds as investment options, the Complaint must allege at least some plausible basis for an inference that

14

the fees associated with those funds were unreasonable.  *See Amron*, 464 F.3d at 344 (affirming dismissal of fiduciary duty claim under the Investment Company Act of 1940 ("ICA") because plaintiffs "have not set forth those facts necessary to a finding that the fees were excessive"); *Fitzgerald v. Citigroup*, 2007 WL 582965 at *10 (S.D.N.Y. Feb. 23, 2007) (to survive motion to dismiss, fiduciary duty claim under the ICA based on mutual fund fees "must allege facts that, if true, would support a claim that the fees at issue are excessive") (citations omitted).[9]  Merely uttering that fees charged to the Plan were "unreasonable" does not state a claim for breach of fiduciary duty – for that is nothing more than a bare conclusion.  *See Twombly*, 127 S. Ct. at 1964-65 (stating that Rule 8(a) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

The sole factual basis for plaintiffs' claim – *i.e.*, that expenses for the Fidelity Funds were higher than those of other alternative investment funds – does not support a claim for breach of fiduciary duty.  If fees alone were enough to establish imprudence, no ERISA plan would offer actively managed mutual funds.[10]  Plaintiffs also ignore that mutual funds are subject to legal requirements under the ICA and SEC regulations that provide added protections and benefits to investors, and which do not apply to collective trusts or other unregistered pooled investment vehicles.  For example, mutual funds such as those offered by Fidelity are registered with the

---

[9] These cases provide a useful analogy because § 36 of the ICA, like § 404(a) of ERISA, codifies in federal statute the fiduciary duty principles of the law of trusts.  *See In re Gartenberg*, 636 F.2d 16, 18 (2d Cir. 1980) (§ 36 of ICA adopted federal standard for trust-law fiduciary relationship between investment company and advisor); *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (fiduciary duties under ERISA "draw much of their content from the common law of trusts").

[10] Under plaintiffs' theory, the vast majority of the thousands of 401(k) plans offered by U.S. employers would violate ERISA because such plans routinely include actively managed mutual funds offered by Fidelity and other fund sponsors among the investment options offered to plan participants.

SEC and (1) are required to have a majority of independent directors, (2) are subject to the Sarbanes-Oxley Act, (3) must comply with SEC-imposed diversification requirements and limitations on borrowing, (4) must provide investors with statutory prospectuses, and (5) are prohibited from offering shares to investors on terms that do not share the costs and expenses of running the fund equally among investors.  *See generally* Kleiman, et al., *Forming, Organizing and Operating a Mutual Fund:  Legal and Practical Considerations*, 1589 PLI/Corp 235 (PLI, 2007).  Plaintiffs do not allege that the expense ratios of the Fidelity funds offered to Plan participants were "excessive" compared to those of other SEC-registered mutual funds. [11]

Nor do the DOL advisory opinions cited in the Complaint provide any basis for plaintiffs' claim in Count II.  The cited opinions state that plan fiduciaries must consider a variety of factors in assessing investment options, including fees charged, and must act solely in the interests of the plan in selecting investments.  (Cmplt. ¶¶ 81-84)  The Complaint does not allege that GMIMCo failed to evaluate and assess the merits of the Fidelity Funds (including their expenses) that were among the Plans' investment options.  And the Complaint does not allege that GMIMCo included those funds for any reason other than its determination of what was in the best interests of the GM Plans and their participants.  Nothing in these advisory opinions, or any DOL

---

[11] Indeed, there is ample objective evidence of which the Court may take judicial notice that the Fidelity Funds offered by the GM Plans, on the whole, compare favorably to other mutual funds when it comes to expenses.  Lipper, a world leader in the assessment and evaluation of mutual funds, assigns ratings to virtually every widely held mutual fund based on a number of factors, including the expenses charged by the funds to their shareholders.  Of the 45 Fidelity Funds offered by the Plans at the time plaintiffs' filed their Complaint, 34 were rated in the top 20% of similar funds for having low expenses.  (Ex. F at 12-145 (Exhibit F is a collection of ratings published by Lipper under the "Lipper Leaders" scoring system.  The methodology behind the Lipper assessment system is reflected on the initial pages of Exhibit F.))  Of the 11 Fidelity Funds that were not in top 20%, 10 were in the top 40% in terms of favorable expense ratios.  (*Id.* at 146-85)  The one exception was the Fidelity Global Balanced Fund, which had higher expenses than most comparable funds, but was nevertheless a "Lipper Leader" in total and consistent returns.  (*Id.* at 186-87)

regulations, suggests that the fees charged by retail mutual funds make them imprudent investment options for defined-contribution pension plans.

### C. Plaintiffs Have Failed To State A Claim That The Expenses And Fees Associated With The Fidelity Funds Have Caused Any Damage To The Plans.

In an action for damages under ERISA § 409(a), "both loss to the fund, and a causal connection between that loss and defendant's breach, are necessary elements of an ERISA claim." *Salovaara v. Eckert*, 1998 WL 276186, at *4 (S.D.N.Y. May 28, 1998). *See also Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (loss causation is necessary element of claim for damages under ERISA § 409(a)). To satisfy this element, plaintiffs must allege more than a bare conclusion that selection of certain Fidelity funds caused some loss to the Plans. *See Amron*, 464 F.3d at 343-44, citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (where loss causation is element of plaintiff's claim, complaint must allege facts sufficient to establish that element).

Plaintiffs identify three specific Fidelity funds to support their claim that GMIMCo exposed the Plans to excessive fees. None of these three examples, however, provides a plausible basis for a claim that the Plans suffered any losses by including Fidelity Funds among the menu of available investment options. Moreover, plaintiffs' allegations and the facts properly before the Court on this motion refute any such conclusion.

As noted above, plaintiffs point to the Fidelity Diversified International Fund, which they allege had an expense ratio of 1.01% in 2005. (Cmplt. ¶ 74) Plaintiffs claim that the Plans could have saved $1 million a year in fees by instead paying an investment manager "for investment advisory services similar to those provided to the Diversified International Fund." (Cmplt. ¶ 74) This allegation fails to state a claim for damage to the Plans. First, the Court can take judicial notice that participants in the Plans *did* have a lower-cost option. The Plans also offered the

17

Promark International Equity Fund, which had an expense ratio of 0.40% – *i.e.*, less than half of the comparable Fidelity fund.  (Ex. G at 2)  Participants who did not want to pay greater fees for the Fidelity brand name, reputation, fund-management expertise, and other benefits associated with SEC regulation, could choose the Promark fund instead.

Moreover, the Complaint does not allege that an unspecified, hypothetical investment manager who charged lower fees would have achieved the same total return (net of fees) as the managers of the Fidelity fund.  In other words, they do not allege the total value of Plans was diminished as result of the 0.25% they claim the Plans could have saved by shopping for a "cheaper" investment option.  Indeed, for the five years ending December 31, 2005, the Fidelity Diversified International Fund had an average annual return of 9.51%, while the low-fee Promark International Equity Fund had an average annual return of 5.68%.  (*Id.* at 2, 3)

Plaintiffs raise a similar complaint about the Fidelity Balanced Fund, which they claim had an expense ratio of "64 basis points" (*i.e.*, 0.64%).  (Cmplt. ¶ 75; Ex. G at 4)  They allege that the Plans could have saved $2.7 million in fees over the last six years by instead offering an SSgA Life Solutions Balanced Fund, which they claim had expenses of 0.31%.  (Cmplt. ¶ 75)  But the Plans ***did*** offer an even lower-cost alternative fund – the Promark Balanced Fund, which had an expense ratio of only 0.28%.  (Ex. G at 2)  Moreover, as with the two international funds discussed above, the Fidelity Balanced Fund had significantly higher five-year returns (8.06% versus 6.17%) than the lower-fee Promark Balanced Fund.  (*Id.* at 2, 4)[12]

Plaintiffs' specific examples aside, their allegations still would not state a claim for breach of fiduciary duty against GMIMCo.  Plaintiffs base their claim on the implicit, but wholly

---

[12] Plaintiffs' final example is the Fidelity Spartan 500 Index Fund, which they claim has excessive fees in comparison to State Street's S&P 500 Flagship Fund.  (Cmplt. ¶¶ 75-76)  But the Fidelity Spartan 500 Index Fund was not even offered by the Plans, and thus its fees provide no support for any claim for breach of fiduciary duty.

speculative, assumption that investing in lower-cost funds would have resulted in higher net returns.  But the Complaint alleges no plausible factual basis for this conclusion.  At bottom, the problem with plaintiffs' theory is that it would render any investment imprudent simply because there is a some alternative investment that charges lower fees.  ERISA provides no cause of action for the myopic and illogical claim that the fees associated with an investment are the *sine qua non* of its prudence – especially given the particular fees that plaintiffs have alleged are "excessive" in this case.

> **D.    Plaintiffs' Claim Involving The Fidelity Funds Is Barred By ERISA § 404(c), Which Expressly Exempts Participant Controlled Accounts From Claims For Breach Of Fiduciary Duty Arising From Investment Losses.**

Even if plaintiffs' Complaint were sufficient to establish that the Plans suffered some losses as a result of the fees charged by the Fidelity Funds, Count II would still fail because GMIMCo did not cause those losses.  Contrary to the allegations of the Complaint, GMIMCo did not cause the Plans "to make or maintain investments in Fidelity Funds."  (Cmplt. ¶ 97)  Plan participants, not GMIMCo, made the decision to invest every single dollar that the Plans put into the Fidelity Funds.  The Plans are participant-directed plans, and plaintiffs do not (and cannot) allege that Plan communications did not consistently and expressly tell participants they were responsible for making investment choices, *i.e.*, that participants did, in fact, "exercise control" over the Plans' investments in the Fidelity Funds.  (Ex. A at 9; Ex. B at 7)

ERISA § 404(c) provides fiduciaries with a "safe harbor" from claims for losses resulting from investment decisions such as those made by plaintiffs in choosing to invest in the Fidelity Funds.   Section 404(c) provides, in relevant part, that if a plan "provides for individual accounts," "permits a participant or beneficiary to exercise control over the assets in his account," and the "participant or beneficiary exercises control over the assets in his account," then "no person who is otherwise a fiduciary shall be liable under this part for any loss, or by

reason of any breach, which results from such participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c).   Plaintiffs cannot dispute that the Plans provided participants with individual accounts that permitted participants to control whether assets in their accounts are invested in the Fidelity Funds.  Nor can they dispute that to the extent any participants invested in the Fidelity Funds, those investments (and hence all Plan investments) in the Fidelity Funds were made as a result of participants' exercise of control over their accounts.[13]

A claim identical to plaintiffs' was recently dismissed in *Hecker v. Deere & Company*, No. 06-C-719-S, Mem. Op. (W. D. Wis. June 21, 2007) (copy attached as Exhibit H).  In *Hecker*, the plaintiffs brought a claim against their employer, Deere, alleging that the company had breached its fiduciary duty to participants in the company's 401(k) plan by offering Fidelity funds – the very same funds at issue in this case – as investment options on the theory that the fees associated with the Fidelity funds were "excessive and unreasonable."  (Ex. H at 5, 12)  Like the GM Plans, the Deere plan offered a broad menu of investment options that included a number of different funds issued by Fidelity, as well as other investment alternatives.  (*Id.* at 3-4)  Also, just as in this case, Deere provided information to participants that disclosed the expense ratios attributable to each fund for consideration by plan participants as they made investment decisions.  (*Id.* at 4, 15-16 ("When participants made their investment decisions they had access to the expense ratio for each investment fund and could take those expenses into consideration.")).

The *Hecker* court first held that the plaintiffs' complaint (and the documents deemed incorporated therein) established that Deere had complied with Section 404(c) and regulations

---

[13]   Indeed, although plaintiffs erroneously allege that investments in the Single Equity Funds "were not at the election of participants" (Cmplt. ¶ 85), they make no such allegation with regard to the Fidelity Funds.

promulgated thereunder, *see* 29 C.F.R. § 2550.404c-1, thus entitling Deere to the protections of

the "safe harbor" against claims for losses caused by the participants' exercise of control over

their investments.[14]    (Ex. H at 13-15)    The regulations promulgated by the DOL under

Section 404(c) generally provide that a participant is deemed to exercise control over his account

if:  (1) the plan grants him or her a "reasonable opportunity" to provide investment instructions

to a plan fiduciary obligated to comply with such instructions; (2) the participant or beneficiary

has the opportunity to obtain sufficient information to make informed decisions with regard to

investment alternatives; and (3) the plan offers a broad range of investment alternatives.  *See*

*generally* 29 C.F.R. § 2550.404c-1.  Plaintiffs do not allege – and cannot contend in light of the

contents of the documents incorporated by reference into their Complaint – that the GM Plans

failed to meet all the requirements of these regulations with respect to any investment in the

Single Equity Funds.

    The *Hecker* court also rejected plaintiffs' argument that, despite Deere's compliance with

Section 404(c), plan participants had nevertheless not "caused" the alleged losses.  The court

held that because participants "were in a position to consider and adjust their investment strategy

based on part on the relative cost of investing in these funds," the "only possible conclusion" was

---

[14] Though § 404(c) provides an affirmative defense to plaintiffs' claim, it is no different from
any other affirmative defense, and, as such, can properly dispose of a claim on a motion to
dismiss if the defense is apparent on the face of the complaint.  In *Hecker*, the court rejected the
argument that a § 404(c) cannot serve as the basis for a motion to dismiss.  (Ex. H at 13 ("[A]
motion to dismiss may be based on a defense provided that the allegations of the complaint (and .
. . documents deemed to be part of the complaint) establish all the ingredients of the defense.")
*See also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2nd Cir. 1998) (affirming
district court's finding that the complaint itself established the facts necessary to sustain
defendant's immunity defense); *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (court
may dismiss a claim on the basis of an affirmative defense if "the facts supporting the defense
appear on the face of the complaint"); *Davey v. Dolan*, 453 F. Supp. 2d 749, 755 (S.D.N.Y.
2006) (affirmative defense can be upheld on a Rule 12(b)(6) motion "if it is clear from the face
of the complaint that the plaintiff's claims are barred").

that any losses resulting from incurring fees associated with the Fidelity funds "were the result of participants exercising control over their investments within the meaning of the safe harbor provision." (*Id.* at 16)  Participants in the GM Plans were similarly able to, and necessarily did, "exercise control" over their investments when they chose to make and maintain investments in the Fidelity Funds, and their claim for losses suffered as a result of excessive fees charged by the Fidelity Funds must therefore also be dismissed under ERISA § 404(c).

Plaintiff's only effort to avoid the application of Section 404(c) to this claim is their conclusory assertion that ERISA § 404(c) does not provide a safe harbor from imprudent selection and monitoring of a fund." (Cmplt. ¶ 85)  This argument is contrary to both the text and intent of Section 404(c).  As the Fifth Circuit recently held in *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 309-12 (5th Cir. 2007), if a loss is caused by a participant choosing to invest in a particular investment option, Section 404(c) bars that claim ***regardless of any other breach of fiduciary duty that may be alleged in offering such an option***.  *Id.* at 310-11.  The Fifth Circuit also made it clear that the fact that plaintiffs are suing on behalf of the Plans, and not as individual participants per se, does not change this result:  "The Plan 'as a whole' is not entitled to recover money damages for breach where an individual participant, suing on his own behalf, could not recover."  *Id.* at 312.

## CONCLUSION

For the reasons stated above, plaintiff's Complaint should be dismissed.

Dated: June 25, 2007                    Respectfully Submitted,


/s/ James Lee _____
James Lee (JL-5641)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800

Of Counsel

Robert J. Kopecky
Timothy A. Duffy
John W. Reale
Colleen Sorenson
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  (312) 861-2000

*Attorneys for Defendant General Motors
Investment Management Corporation*